**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

PWG FRANCHISING, LLC,

      Plaintiff,

v.                                                 Case No: 6:14-cv-2056-Orl-40TBS

FTL ENTERPRISES, INC., FRANCIS
LEGER, CHRISTINA LEGER and
NUFOCUSMEDIAGROUP, INC.,

      Defendants.
_____/

## ORDER

This cause comes before the Court on the following:

1. Plaintiff's Motion for Preliminary Injunction and Memorandum in Support (Doc. 16), filed January 5, 2015; and

2. Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. 41), filed February 6, 2015.

The parties also submitted several declarations in support of their respective positions. (Docs. 28, 29, 44, 48). On February 27, 2015, the Court heard oral argument and testimony from the parties on Plaintiff's Motion for Preliminary Injunction, and orally granted the preliminary injunction. (Doc. 50). This Order memorializes the Court's findings of fact and conclusions of law rendered at the evidentiary hearing.

**I.    FINDINGS OF FACT**

Plaintiff, PWG Franchising, LLC ("PWG"), is a franchisor of franchise businesses featuring the publication and marketing of wedding products and services known as the Perfect Wedding Guide®. PWG maintains its principal place of business in Lake Mary,

Florida. PWG owns multiple marks, including Registration Numbers 3356391, 4119303, and 4061371. The trademarks are currently in full force and effect.

Defendant, FTL Enterprises, Inc. ("FTL"), is a former PWG franchisee. Defendants, Christina and Francis Leger (the "Legers"),[1] are the sole owners of FTL. PWG, as franchisor, and FTL, as franchisee, were parties to two Franchise Agreements (the "Franchise Agreements") for the operation of a Perfect Wedding Guide® franchise business in Hillsborough, Pinellas, Pasco, Hernando, and Sarasota Counties. (Pl. Exs. 1, 2).[2] Under the Franchise Agreements, PWG allowed FTL to promote, market, and sell advertising for the Perfect Wedding Guide® using PWG's federally registered trademarks, service marks, related insignia and designs, and PWG's system. (*Id.*).

In 2012, disputes arose between the parties concerning FTL's obligations under the Franchise Agreements and, in April 2012, PWG filed suit against FTL in state court for breach of contract. The parties settled that dispute in September 2013, which was memorialized in a settlement agreement (the "Settlement Agreement"). (Pl. Ex. 4). Under the Settlement Agreement, PWG and FTL re-affirmed the Franchise Agreements, and FTL agreed to pay PWG $68,250.00 in weekly installments of $1,000. However, FTL was unable to pay this amount. Based on this and other defaults, PWG sent FTL a notice of default on August 8, 2014 (the "Default Notice"). (Pl. Ex. 5).

On November 11, 2014, PWG terminated its Franchise Agreements with FTL due to its position that FTL failed to cure breaches of the Franchise Agreements and the related Settlement Agreement, as set forth in the Default Notice. (Pl. Exs. 1, 2, 4, 6). This

---

[1] FTL and the Legers are collectively referred to as the "Defendants" in this Order.
[2] The exhibits referenced are those submitted to the Court at the February 17, 2015 evidentiary hearing on Plaintiff's Motion for Preliminary Injunction.

termination ended FTL's rights as a PWG franchisee and triggered post-termination obligations. Despite the termination, FTL continued to use PWG's marks as evidenced by the Legers' continued use of "mypwg.com" email addresses (Pl. Ex. 7) and operation of a bridal show in Tampa, Florida on January 18, 2015 (the "Tampa Bridal Show") (Pl. Exs. 9, 10). Some of the advertising or marketing material for the Tampa Bridal Show included the email address of info@mypwg.com (Pl. Ex. 10, p. 4) and the personal PWG email addresses of the Legers. (*Id.* at p. 12). The record also revealed that Defendants planned to continue to operate in the bridal industry, as shown by their advertisement of upcoming events. (*Id.* at p. 8). The Facebook page for the Tampa Bridal Show also indicated "Perfect Wedding Guide" under the contact information. (*Id.* at p. 26).

## II. CONCLUSIONS OF LAW

A plaintiff is entitled to preliminary injunctive relief upon establishing: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). A preliminary injunction is an extraordinary remedy that should only be entered upon the movant establishing each of the four requisite elements. *Id.*

PWG argues that it is entitled to an injunction on its trademark infringement claim and its breach of restrictive covenant claim. (Doc. 16). The Court agrees and grants a preliminary injunction as to both claims.

**A. Trademark Infringement**

**1. PWG is Substantially Likely to Succeed on the Merits of its Claims under The Lanham Act**

PWG brings its first claim for injunctive relief under the Lanham Act. "The Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir. 1987). "[A] terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement." *Burger King Corp. v. Majeed*, 508 F. Supp. 994, 1002 (S.D. Fla. 1992).

Moreover, Section 10.3 of the Franchise Agreements limits FTL's right to use PWG's trademarks and copyrights, as follows:

> You must not: (a) use any Mark or Copyright as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any modified form; (b) use any Mark or Copyright or any commercial symbol similar to any Mark in connection with the performance or sale of any unauthorized services or products, or in any other manner we have not expressly authorized in writing; (c) employ any of the Marks or the Copyrights in any manner that we have determined may result in our liability for any indebtedness or obligation of yours. You will display the Marks or the Copyrights in the manner we prescribe at your Perfect Wedding Guide® Business and in connection with advertising and marketing materials, along with any notices of copyright, trademark and service mark ownership registrations that we specify. You will also have to obtain any fictitious name, assumed name or "doing business as" registrations that may be required under applicable law.

(Pl. Exs. 1, 2).

PWG submitted evidence at the preliminary injunction hearing that there has been consumer confusion in the wedding marketplace as a result of FTL and the Legers

4

continuing to operate in the bridal industry. For example, customers have contacted PWG after not receiving products or services that those customers contracted with the Legers for. Those customers expected reimbursement from PWG. After reviewing all of the evidence and hearing testimony from Tammy Elliot, President and CEO of PWG, the Court finds that PWG carried their burden in demonstrating that there has been a likelihood of consumer confusion in the bridal marketplace as a result of Defendants' actions. At a minimum, Defendants used PWG's marks to operate the Tampa Bridal Show.

### 2. Defendants' Continuing Infringement of PWG's Marks Will Irreparably Injure PWG

Given the strong likelihood of consumer confusion and PWG's substantial likelihood of success on the merits, PWG has met its burden of demonstrating that it will irreparable injury if Defendants' actions are allowed to continue. *See Sundor Brands, Inc. v. Borden, Inc.*, 653 F. Supp. 86 (M.D. Fla. 1986) ("The law is settled that the existence of a likelihood of confusion constitutes irreparable injury, as a matter of law, sufficient to satisfy the requirements of Fed. R. Civ. P. 65.").

### 3. The Threatened Injury to PWG Outweighs Any Threatened Harm to Defendants

The threated harm to PWG outweighs any harm Defendants may suffer from the granting of injunctive relief. Defendants' self-inflicted harm in choosing to continue to operate in the bridal industry after the termination of the Franchise Agreements is outweighed by the damage done to PWG by the infringement of its marks. *Clayton v. Howard Johnson Franchise Sys., Inc.*, 730 F. Supp 1553, 1561–62 (M.D. Fla. 1988).

### 4. The Injunction Will Not be Adverse to the Public Interest

Lastly, the relief PWG requests is not adverse to the public interest. Consumers, including brides, grooms, and wedding vendors, rely upon the PWG marks in doing business with PWG franchisees. They are then deceived into giving Defendants their business under the mistaken belief that they are a legitimate PWG franchisee. Granting injunctive relief to PWG will in fact serve the public interest by preventing consumer confusion.

### B. The Restrictive Covenant

#### 1. Florida Law Controls

PWG seeks to enforce a restrictive covenant which prevents FTL and the Legers from operating in the bridal industry as specified in Section 18.6 of the Franchise Agreements. (Pl. Exs. 1, 2). As a preliminary matter, the Court must determine whether Georgia law or Florida law applies to the Franchise Agreements and Settlement Agreement (Pl. Exs. 1, 2, 4) and thus, to the enforcement of the restrictive covenant. The Franchise Agreements between the parties provide, in pertinent part, "This Agreement and the Franchise are governed by the law of the state in which our principal headquarters is located . . . ." (Pl. Ex. 1, p. 31; Pl. Ex. 2, p. 32). Under Georgia law, restrictive covenants are unenforceable. Under Florida law, restrictive covenants are enforceable. Accordingly, FTL argues that PWG is headquartered in Atlanta, Georgia, while PWG argues that it is headquartered in Lake Mary, Florida.

The first page of the contract lists PWG's principal place of business as 55 Skyline Drive, Suite 2700, Lake Mary, FL 32746. (*Id.* at p. 1). Moreover, Jacky Warren, Comptroller for PWG, testified at the hearing that all financial operations, banking, and

art and development take place out of the Lake Mary Office. Twenty out of thirty-seven employees work out of the Lake Mary Office. The majority of the decisions made by the CEO of PWG are implemented in the Lake Mary Office. The Franchise Agreements, combined with the testimony of Ms. Warren, lead the Court to conclude that PWG is headquartered in Lake Mary, Florida. Accordingly, Florida law applies to the enforcement of the restrictive covenant.

### 2. PWG is Substantially Likely to Succeed on its Claim to Enforce the Restrictive Covenant

Section 18.6 of the Franchising Agreements contains a restrictive covenant against competition which provides:

> [D]uring the Term, and for a period of 3 years following its expiration, termination for any reason or transfer (to anyone), unless we otherwise permit in writing, you must not directly or indirectly (whether as owner, partner, associate, agent, consultant, employee, stockholder, officer or otherwise of another or on your own account do any of the following [prohibited activities listed in subsections (a) through (c)].

(Pl. Exs. 1, 2). In Section 18.6, Defendants specifically agreed to not:

> (a) Participate in the development of, or engage in or contribute your knowledge to any work or activity that relates to or involves any of the Confidential Information or is in any way engaged in the business of publishing, distributing or selling advertising for any Publication or other publication distributed by direct mail or via distribution racks that features advertising content (with coupons or otherwise) for 50% or more of its content (a "**Competitive Business**"): (i) within the Territory; (ii) within any geographic territory that we have assigned to any one of our other Perfect Wedding Guide® Businesses, employees, or Franchisees, or in which we directly operate, market or sell; (iii) via the Internet or other form of e-commerce, wherever located; or (iv) within 40 miles of any geographic area that we have awarded to any other Perfect Wedding Guide® Business as of the date of termination or expiration of this Agreement. (b) Induce or attempt to induce, or solicit any of our or other The Perfect Wedding Guide® Businesses' strategic partners, clients, customers, Advertisers, referral sources or employees, Associates or other independent contractors to accept employment or an affiliation involving work that may be competitive to our (or our affiliates') businesses or otherwise with any

7

> Competitive Business of which you are an employee, owner, partner, shareholder, consultant or agent, or which may reasonably relate to any of the Confidential Information; and/or (c) Solicit, divert, contact, take away or interfere with any of our businesses, Advertisers, customers, clients, referral sources, insurers, suppliers, or contractors with whom we (or our affiliates) do business or whom you know we have contacted or solicited for business relationships, or those of any of our affiliates or Franchisees, as of the date of termination of this Agreement.
>
> (b) Induce or attempt to induce, or solicit any of our or other The Perfect Wedding Guide® Businesses' strategic partners, clients, customers, Advertisers, referral sources or employees, Associates or other independent contractors to accept employment or an affiliation involving work that may be competitive to our (or our affiliates') businesses or otherwise with any Competitive Business of which you are an employee, owner, partner, shareholder, consultant or agent, or which may reasonably relate to any of the Confidential Information; and/or
>
> (c) Solicit, divert, contact, take away or interfere with any of our businesses, Advertisers, customers, clients, referral sources, insurers, suppliers, or contractors with whom we (or our affiliates) do business or whom you know we have contacted or solicited for business relationships, or those of any of our affiliates or Franchisees, as of the date of termination of this Agreement.

(*Id.*). The restrictive covenant also applies to the Legers in their personal capacities. In Section 16.2, the Legers agreed that the Franchise Agreements were "personal" to them as owners of FTL. (*Id.*).

The Settlement Agreement entered into between PWG, FTL, and the Legers provides in paragraph 5:

> Franchisee acknowledges and agrees that for the purposes of Section 18.6 of the Franchise Agreements, a "Competitive Business" includes any commercial venture by Franchisee or its owners involving the bridal industry, including without limitation any business relating to the bridal industry that includes print, web or internet-based leads, networking or bridal shows. Franchisee agrees that it will not operate or in any way be affiliated with any "Competitive Business" during the term specified in Section 18.6 of the Franchise Agreements.

(Pl. Ex. 4).

PWG is substantially likely to succeed on its claim for breach of the restrictive covenant because the covenant is in place to support legitimate business interests. Florida law dictates whether or not a restrictive covenant provision is appropriate, depending on its scope and breadth. Under Florida law, a non-compete agreement is enforceable if it seeks to protect "one or more legitimate business interests." Fla. Stat. § 542.335(1)(b) (2014). First, PWG possesses a legitimate business interest in the protection of its marks and the goodwill associated with those marks in the counties where Defendants have continued to operate in the bridal industry. Second, PWG possesses a legitimate business interest in preventing Defendants' unauthorized use of confidential information obtained through the franchise relationship. Third, and most importantly, PWG has a legitimate business interest in protecting customer goodwill associated with PWG.

Moreover, the Court finds that the restrictions in the covenant are reasonable in time, area, and line of business. Fla. Stat. § 542.335(1) (2014). The restrictive covenant prevents competitive activity: (1) within Defendants' franchise territory, (2) within other geographic territories that PWG has assigned to other Perfect Wedding Guide® businesses, employees, or franchisees, or in which PWG directly operates, markets, or sells, (3) via the internet or other form of e-commerce, or (4) within forty miles of a geographic area that PWG has awarded to another Perfect Wedding Guide® business. (Pl. Exs. 1, 2). Further, the three-year duration of the restrictive covenant is a reasonable period of time to permit PWG a fair opportunity to establish a new franchise within Defendants' prior territory. Thus, the restrictive covenant is narrowly tailored, not

overbroad, and reasonably formulated to protect PWG's legitimate business interests. PWG has met its burden of demonstrating that it has a substantial likelihood of success on the merits of its claim for breach of the restrictive covenant by virtue of Defendants' continued operation of a competitive business in the bridal industry in the greater Tampa Bay area.

### 3. PWG Demonstrates Irreparable Injury

"The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." Fla. Stat. § 542.335(1)(j) (2014). Thus, PWG has demonstrated irreparable injury arising from Defendants' violations of the restrictive covenant.

### 4. The Balance of Harm Weighs in Favor of PWG

As stated previously, the threatened injury to PWG outweighs any damage Defendants may suffer from the granting of injunctive relief because Defendants' harm in choosing to continue to operate in the bridal industry after the termination of the Franchise Agreements is self-inflicted. Defendants cannot now disregard their obligations under the restrictive covenant. The harm to PWG would be substantial if Defendants did not comply with the restrictive covenant because PWG has invested significant time and money developing and establishing its presence in the greater Tampa Bay area bridal industry.

### 5. The Injunction Will Not be Adverse to the Public Interest

A preliminary injunction will not be adverse to the public interest because it will encourage parties to adhere to contractual obligations. Moreover, Florida law contemplates the entry of an injunction to enforce reasonably restrictive covenants. Defendants have not offered any evidence of a public policy interest that substantially

outweighs the need to protect PWG's legitimate business interests. *See* Fla. Stat. § 542.335(1)(i). Therefore, the Court finds that PWG is entitled to a preliminary injunction to enforce its restrictive covenant with Defendants.

## III. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Preliminary Injunction and Memorandum in Support (Doc. 16) is **GRANTED.**

It is further **ORDERED** that:

1. Defendants, their agents, servants, and employees, and those people in active concert of participation with them are preliminarily **ENJOINED** from:
    a. Using PWG's marks and any trademark, service mark, logo, or trade name that is confusingly similar to PWG's marks, including the mark PERFECT WEDDING GUIDE® and any variation thereof;
    b. Otherwise infringing upon PWG's marks or using any similar designation, alone or in combination with any other components;
    c. Passing off any of their products or services as those of PWG or of its authorized franchisees;
    d. Causing a likelihood of confusion or misunderstanding as to the source of sponsorship of their businesses, products, or services as being PWG's or its authorized franchisees;
    e. Causing a likelihood of confusion or misunderstanding as to Defendants' affiliation, connection, or association with PWG or its authorized franchisees; and

f. For a period of three years, engaging in a Competitive Business (as defined in paragraph 5 of the Settlement Agreement): (i) within Defendants' franchise territory, (ii) within other geographic territories that PWG has assigned to another Perfect Wedding Guide® business, employees, or franchisees, or in which PWG directly operates, markets, or sells, (iii) via the internet or other form of e-commerce, or (iv) within forty (40) miles of a geographic area that PWG has awarded to another Perfect Wedding Guide Business®.

2. PWG shall post a bond in the amount of $50,000.00 **on or before March 16, 2015**.

**DONE AND ORDERED** in Orlando, Florida on March 2, 2015.

*[Signature]*
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record